### ACTION TOWING AND RENTAL and Martial H. Voitier, II, d/b/a Tulane Avenue Gulf

### v.

### U–HAUL INTERNATIONAL et als.

Civ. A. No. 77–1322.

United States District Court,
E. D. Louisiana,
New Orleans Division.

Feb. 27, 1981.

---

Jacques F. Bezou, New Orleans, La., for plaintiff.

Charles W. Lane, III, New Orleans, La., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BEER, District Judge.

To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are so adopted.

## Findings of Fact

1. Jurisdiction is alleged pursuant to 15 U.S.C. § 2 and § 15, more commonly known as the Sherman Act and Clayton Act, respectively.

2. Plaintiff, Action Towing and Rental ("Action Towing," hereinafter), a Louisiana corporation which at all times relevant was operating its business at Tulane Avenue Gulf Service Station (3326 Tulane Avenue), brings this action under the Sherman Act 15 U.S.C. § 2. The sole shareholder and chief operating officer of Action Towing is and has been, at all times pertinent, Martial H. Voitier, II.

3. Plaintiff seeks damages for the allegedly improper termination of its contended business relationship with defendants, U-Haul Company of Southern Louisiana, Amerco, U-Haul International, U-Haul Company, Inc. and L. S. Shoen.

4. Amerco is the sole shareholder of each of the other corporate defendants. U-Haul International acts as the accounting clearing house for the various entities comprising the U-Haul system. It also provides technical assistance in the fields of engineering, advertising, personnel, traffic, merchandising, management and purchasing. U-Haul Company of Southern Louisiana is the operating company which conducts the business of renting trucks, trailers and accessory equipment in the southern part of Louisiana and parts of southern Mississippi. U-Haul, Inc. is a non-operating, dormant corporation, which has no function at the present time. L. S. Shoen is the chairman of the board, president of Amerco and a stockholder of Amerco.

5. The defendants (hereinafter collectively referred to as "U-Haul") constitute a business unit that represents the U-Haul system of marketing rental trucks, trailers, equipment and related services on a nationwide basis.

6. Pursuant to a contract dated January 3, 1973, Action Towing and Rental became the rental agent or dealer for U-Haul equipment on the premises of Tulane Avenue Gulf Service Station, 3326 Tulane Avenue. (PTO uncontested facts p. 14.)

7. ¶ 16 of that contract provides that it may be terminated by either party on thirty days written notice. By letter dated March 23, 1977, U-Haul gave notice to Action Towing that the contract would be terminated effective April 30, 1977. The effective date of cancellation was subsequently extended by agreement to May 30, 1977. (PTO uncontested facts p. 14.)

8. On June 7, 1977, Action Towing became the rental agent or dealer for Hertz Corporation at the same location. (PTO uncontested facts p. 14.)

9. Plaintiff bases its contentions on a claim of monopolization under Section 2 of the Sherman Act. For a cause of action under § 2, plaintiff claims that U-Haul possessed monopoly power in a relevant market and that the termination of Action Towing as a U-Haul rental agent in May of 1977 was an unlawful exercise of that power in furtherance of a plan to eliminate price competition among U-Haul dealers and between U-Haul dealers and company operated Moving Centers.

Defendants challenge plaintiff's ability to maintain an action under 15 U.S.C. § 2, arguing that plaintiff lacks standing to bring a treble damage suit under the Sherman Act because plaintiff is unable to allege competitive injury. In fact, considering the commercial relationship of the parties involved, defendants allege plaintiff is not a competitor of the defendants.

10. The trade name "U-Haul," and U-Haul trucks, trailers and equipment are known nationwide, and as such are associated with the concept of do-it-yourself household moving. U-Haul has developed a system whereby a person can move themselves by renting equipment at one place and leaving it anywhere else throughout the United States. Hence, the concept of one-way trailer rental. This system consists of a network of rental pickup and delivery locations throughout the country. (PTO uncontested facts p. 14.)

11. In order to provide this network of rental pick-up and delivery locations

throughout the United States, U-Haul developed agreements with local rental agents, a/k/a "dealers," who usually owned and/or operated neighborhood service stations. Under these agreements, the dealer agreed to provide space at the service station to display trucks and trailers and also agreed to use, on a part-time basis, service station personnel to rent and receive the equipment, perform minor maintenance on the equipment and process the necessary paperwork. For these services, the dealer is paid a commission (on the average 20%) on the gross rentals collected from the customer. The terms and conditions of the arrangement between the dealer and U-Haul are set forth in the particular dealership contract.

12. All of the trucks, trailers and other rental equipment provided by U-Haul to Action Towing pursuant to the written contract belonged to U-Haul and title remained at all times in U-Haul. Investment in the equipment was made by U-Haul and the risk of loss for the equipment was borne by U-Haul. U-Haul assumed the obligation to indemnify Action Towing against any and all liability for property damage or personal injury to third parties arising out of accidents involving the U-Haul equipment. (PTO uncontested facts p. 15.)

13. U-Haul had the right to establish the rental rate at which the trucks, trailers and other rental equipment provided to Action Towing and other dealers were rented. U-Haul has the contractual right to insist that rental agents conform to rental rates published and distributed by U-Haul to its dealers. (PTO uncontested facts p. 15.)

14. In the ordinary course of its executive actions, the management of U-Haul determined that it was in its business interest to open company-owned operations at certain locations, usually in metropolitan areas, known as "Moving Centers." This concept developed during the early 70's as a result of the expansion of U-Haul's product line to meet rapidly developing (and changing) public demands during that period. Other business factors also came into consideration, such as the cost of moving the expanding inventory from dealer to dealer to accommodate fluctuations in demand, the advent of the self-service gasoline station as a replacement for full service stations, the annual turnover rate among U-Haul dealers, the increasing loss of rental equipment due to theft or conversion and the inflation impact on property values and cost of borrowing.

15. The Moving Centers were not calculatedly designed to replace all neighborhood dealers but developed as a necessary adjunct of a viable U-Haul system doing business on a national basis in a manner best able to keep pace with the expanding and changing market.

16. The particular Moving Center about which plaintiff mainly complains is located at 2801 Tulane Avenue in the City of New Orleans. It provides a central location in the downtown metropolitan area to service customers. It includes a maintenance facility, a central dispatcher, and also provides assistance and inventory to those dealers who serve the metropolitan area. It provides a considerably wider range of products and services than Action Towing was physically able to provide at its location. (Defendant Exhibit Nos. 17a, 17b, 17c and 17d.)

17. Voitier's service station measures 127' on Tulane by 120' on South Jefferson Davis Parkway. At the time Mr. Voitier became a U-Haul dealer, he discussed, with U-Haul representatives, the problems of the limited space of his service station for storage and display of equipment. Voitier represented to U-Haul at that time that he had permission to make use of a large vacant lot across the street from his station. However, Voitier's use of this property was not confirmed by its owner and this resulted in serious problems of offstreet parking of rental equipment which, in turn, resulted in continued problems of care, display and storage of U-Haul equipment.

Those problems reached an acute point when Dibert, Bancroft and Ross, Ltd., the owners of the previously noted lot (across the street from Action Towing), threatened to sue for trespass. Since this was the lot

that Voitier had intended to use for storage and parking, it became even more apparent to defendants that a serious operational problem was becoming critical.

18. Another business problem which reached critical proportions during the pertinent period was in the area of commercial truck rentals by Voitier. U-Haul initially agreed to accommodate Voitier in continuing this commercial business (as compared to the self-moving of household goods), notwithstanding the fact that U-Haul equipment was not designed for this basic purpose. U-Haul personnel testified that the U-Haul equipment was abused by Voitier's commercial accounts and a Mr. Frank, a former Amerco District Vice President, was required to meet with Voitier on various occasions to discuss the type of rentals being promoted by Action Towing, noting the significantly higher repair costs resulting from these kinds of rentals.

19. Voitier testified that roughly half of his business was commercial, whereas U-Haul's one-way gross rentals in every year far exceeded its revenue from local commercial rentals, thus indicating a marked difference in their respective business philosophies. Action Towing was not sympathetic to U-Haul's policy relating to so-called commercial rentals. The evidence showed that a substantial amount of Action Towing's business consisted of local industrial commercial rentals which apparently caused unnecessary wear and damage to U-Haul equipment and thereby left the equipment generally unfit for hauling personal household goods. Mr. Frank testified that within the first six months of Action Towing's existence as a U-Haul dealer, the U-Haul equipment assigned to Action Towing, particularly the pickup trucks, was abused to such extent that the matter had to be brought directly to Frank's attention on several occasions. Frank testified that he met with Voitier on various occasions to discuss the high repair cost and the type of rentals being promoted by Action Towing.

20. For the reasons enumerated above, it became apparent to U-Haul management that Action Towing could not handle the type of business U-Haul was seeking nor the volume of business generated in the downtown area. These factors precipitated the ultimate decision to terminate Action Towing on March 23, 1977.

### Conclusions of Law

1. As a prerequisite to any recovery of treble damages, an antitrust plaintiff must prove:
 A. A violation of the antitrust laws by defendant.
 B. An injury to his business resulting from the defendant's wrongful actions.
 C. Some indication of the amount of damage done. *Terrell v. Household Goods Carriers Bureau*, 494 F.2d 16 (5th Cir., 1974).

2. *Dailey v. Quality School Plan, Inc.*, 380 F.2d 484 (5th Cir., 1967), stands for the proposition that a potential plaintiff must be one against whom the alleged anticompetitive conduct is aimed. Only one who has been directly injured by a violation of the antitrust laws is entitled to recover damages.

3. The Fifth Circuit Court of Appeals has adopted a "target area" test as a means of limiting the class of plaintiffs who will most effectively vindicate the antitrust laws. In this contention, it has long been recognized that "antitrust laws were enacted for the 'protection of *competition* not competitors.'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). The law also requires that the plaintiff show that "alleged restraint on trade tends or is reasonably calculated to prejudice the public interest." *Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266 (5th Cir., 1979).

4. The "target area" test administered to satisfy standing requirements under 15 U.S.C. § 15, requires that "complainant must show that he is within that sector of the economy which is endangered by a breakdown of competitive conditions in a particular industry." *Jeffrey v. Southwestern Bell*, 518 F.2d 1129 (5th Cir., 1975).

■ 5. Moreover, the antitrust plaintiff must show that he has suffered some "diminution of his ability to compete." In other words, the plaintiff must prove that the illegal restraint of trade injured his competitive position in the business in which he is or was engaged. *GAF Corp. v. Circle Floor Co., Inc.*, 463 F.2d 752 (2nd Cir., 1972), cert. dismissed 413 U.S. 901, 93 S.Ct. 3058, 37 L.Ed.2d 1045 (1973).

■ 6. In analyzing plaintiff's § 2 claim, it is the court's belief that plaintiff has failed to prove such anti-competitive injury. The dealership contract between Action Towing and U-Haul is a valid consignment agreement and Action Towing is merely an agent-consignee of U-Haul. *Hardwick v. Nu-way Oil Co.*, 589 F.2d 806 (5th Cir., 1979).

7. Because Action Towing was an agent of U-Haul, U-Haul was actually renting its own equipment at the retail level. The substitution for an agent, therefore, caused no change in the intrabrand market. *Hardwick*, supra. U-Haul had the legal right to establish prices at the retail level for its own equipment. This right is uncontested by plaintiff. (PTO uncontested facts p. 15.)

8. Plaintiff's contention that U-Haul's action in terminating it tended to eliminate retail price competition among U-Haul rental agents fails to support a claim that intrabrand competition has been affected. Plaintiff had no legal or contractual right to compete with respect to prices with other U-Haul dealers or moving centers because U-Haul had the legal right to fix the rates at which plaintiff rented U-Haul equipment. Thus there is no legally protected price competition among U-Haul agents that could be lessened by the termination of Action Towing. *American Oil v. McMullin*, 508 F.2d 1345 (10th Cir., 1975). Because the termination of Action Towing as a U-Haul dealer did not change the market for the rental of U-Haul equipment, there was no injury to competition. Rather, the fact that Action Towing has, according to the uncontested evidence, become a competitor of U-Haul (as a Hertz dealer) is pro-competitive rather than anti-competitive.

10. The opening of the Moving Center on Tulane Avenue was motivated by changing market conditions and a desire to provide better service to U-Haul customers at a downtown central location. Furthermore, the termination of Action Towing by U-Haul was justified by Action Towing's failure to comply with the programs, procedures and business philosophies prescribed by U-Haul.

11. Plaintiff has not shown that the alleged illegal restraint of trade impacted competitive conditions in such a manner as to adversely affect the business in which he is or was engaged. In fact, Dr. Seymour Goodman, plaintiff's expert economist, could point to no anti-competitive effect resulting from the termination of Action Towing.

12. Actual developments in the market place prior to and since the termination of Action Towing indicates the lack of antitrust injury to plaintiff. Immediately subsequent to its termination by U-Haul, Action Towing obtained a new supplier and converted its operations from the handling of U-Haul vehicles to handling of Hertz vehicles. Immediately prior to Action Towing's becoming an agent of U-Haul, Martial Voitier was similarly supplied by Ryder Truck Rental.

13. Regardless of the market share held by U-Haul, the evidence here adduced has not shown that U-Haul had or exercised the power to control prices or to exclude competition in a relevant market. See *U. S. v. E. I. Dupont de NeMours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956).

Thus, actual developments in the market place as described above demonstrate that competition has flourished since May, 1977. This failure to demonstrate anti-competitive injury is fatal to an antitrust plaintiff's case. *Brunswick Corp.*, supra.

Plaintiff has failed to demonstrate a valid claim under the antitrust laws and, accordingly, has no standing to claim injury to its business or property under the antitrust laws.

Defendants are directed to prepare a judgment consistent with these findings of fact and conclusions of law.